64 EAST WALTON, INC., Plaintiff-Appellee, *v.* CHICAGO TITLE AND TRUST COMPANY *et al.*, Defendants-Appellants.

First District (5th Division)    No. 77-1091

Opinion filed February 9, 1979.—Rehearing denied March 19, 1979.

Feiwell, Galper & Lasky, Ltd., of Chicago (George S. Feiwell, Michael A. Braun, and Bernard L. Rivkin, of counsel), for appellants.

J. Stirling Mortimer, of Chicago, for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant-lessor, Frances Wallace, appeals from an order entering judgment in the amount of $99,855.24 in favor of plaintiff-lessee for breach of the covenant of quiet enjoyment and entering a finding against her in a counterclaim for breach of certain lease provisions. The issues presented are (1) whether the damage award is contrary to the law and the evidence; and (2) whether the finding against defendant on her counterclaim is against the manifest weight of the evidence.

From the relevant testimony, it appears that on July 16, 1971, plaintiff entered into a written lease of the premises at 64 East Walton Street, in Chicago, with defendant land trustee Chicago Title and Trust Company[1] at the direction of the sole beneficiary, defendant Frances Wallace. The 10-year lease provided for monthly rental payments of $1,500 for the first five years and $1,750 for each of the remaining years. Although the lease term was not to commence until December 1, 1971, plaintiff was granted immediate possession of the first and third floors in consideration of a $6,025 premium paid pursuant to the written agreement. The lease also provided that plaintiff was to have possession of the basement and second floor on October 1, 1971, and if they were not available on that date, plaintiff's rental obligation would be abated by $15 for each day possession thereof was denied.

Concerning other pertinent provisions, paragraph 15 of the lease required plaintiff to keep the interior and exterior of the building in good condition and allowed defendant to make repairs and charge plaintiff therefor in the event plaintiff failed to properly maintain the premises. However, neither paragraph 15 nor any other portion of the lease

---

[1] Chicago Title and Trust Company was dismissed as a defendant in this case.

required plaintiff to occupy the premises. Paragraph 5 permitted plaintiff to use the premises for a restaurant, and paragraph 20 allowed plaintiff to remodel or alter the building, including structural alterations, but prohibited plaintiff from materially changing the front exterior without defendant's written consent. Paragraph "H" of a rider to the lease required plaintiff to deliver to defendant any plans or specifications for proposed remodeling, but did not require approval of the plans by defendant unless the plans contemplated material alterations to the facade. Finally, paragraph 22 provided that the successful party in any suit to enforce the lease or to recover damages in the event of default may recover costs, expenses and reasonable attorneys' fees.

By October 1, plaintiff had access to all floors of the building; but, on about October 8, defendant had all of the locks changed, preventing plaintiff from entering the building. Plaintiff's requests for keys to the new locks went unsatisfied, and on October 20 it filed a complaint for injunctive relief. On October 29, the trial court ordered defendant to provide proper keys, and defendant's counsel tendered them that same day.

In the meantime, George Makris, president and principal shareholder of the plaintiff corporation, had hired Harlan Pratt, an architect, to develop plans for the proposed remodeling of the building for use as a restaurant. In November of 1971, Pratt completed a set of plans, and at least one contractor submitted a bid thereon. These plans were forwarded to defendant's attorney, as required by the lease, but it appears that they met with the disfavor of Mrs. Wallace. At any rate, the plans could not be utilized because they contemplated the use of an open center staircase, which violated fire codes. A second set of plans, intended to resolve the staircase problem, was completed in February of 1972 and a third set, aimed at reducing costs, was developed in March. Sometime in the beginning of April, plaintiff commenced exploratory work, which involved boring holes in the walls at strategic locations to determine the structural feasibility of various remodeling designs.

While the record is not entirely clear, it appears that defendant was not pleased with the lease and that problems developed between the parties with the result that on April 18, 1972, plaintiff filed a petition for supplemental injunctive relief, essentially alleging that defendant had engaged in a course of harassing and obstructious conduct, interfering with the remodeling project. Defendant countered on April 25 with a petition for injunction, alleging that plaintiff's proposed plans for remodeling would materially change the front exterior of the building and that, although defendant did not approve of such plans as required by the lease, plaintiff had commenced work and destroyed a portion of

the subject premises. On April 28, an order was entered reciting that plaintiff had agreed to file an indemnity agreement with defendant covering possible damage occurring in the process of the exploratory work and requiring that, upon delivery of such agreement, defendant was to cease interfering with plaintiff's exploratory work.

Plaintiff then continued with its exploratory work and completed a fourth and final plan for remodeling on June 27, 1972. This represented a major change from the previous plans and allegedly was again aimed at cutting costs. According to Makris, it also satisfied defendant's objections. On July 14, under the final set of plans, plaintiff applied for a building permit which was issued on September 26.[2]

On September 28, defendant filed a second petition against plaintiff, alleging that it failed to reimburse her for the prorated amount of property taxes due as required by the lease; that plaintiff left the premises unoccupied and, as a result, the building had deteriorated and attracted vandals; that defendant incurred expenses in order to protect and maintain the building, including expenditures for repairing the heating unit; and that plaintiff, by these actions, had breached the lease agreement. No order was ever entered resolving any of these allegations.

During the summer of 1972, Makris began contemplating the feasibility of opening another restaurant, and in late 1972 construction began on a new restaurant called "Rascals" in the suburb of Naperville. The total cost of this restaurant exceeded $1 million, approximately $100,000 of which was paid in cash by Makris and the rest financed. Rascals opened for business in May 1973.

On June 14, 1973, defendant filed yet a third petition against plaintiff, alleging basically that plaintiff had failed to maintain the premises in a clean and orderly condition or adequate state of repair; that defendant would therefore be forced to assume the financial responsibility for maintenance; that plaintiff failed to proceed with renovations as previously represented to defendant; and that plaintiff has, by its acts, breached the lease agreement. Defendant requested an order terminating the lease and compensating her for expenses incurred. Again, no order was entered with respect to this petition, but on June 21, plaintiff's attorney sent a letter to defendant's attorney stating its intent to develop revised plans for renovation of the premises and solicit bids within 60 days. On September 5, however, plaintiff informed defendant by letter that it had decided to cancel its renovation plans because of "the present mortgage market and the cost of financing the proposed construction and remodeling of the building."

Further significant events occurred the next month. On October 16,

---

[2] Plaintiff did not commence remodeling, however, and the permit eventually expired.

Makris stopped by the building and noticed that a window was missing, broken glass was lying on the sidewalk, and the facade of the building had been painted. He later ascertained that the painting had been authorized by defendant, without his consent or knowledge. In order to prevent further interference by her, Makris changed all the locks in the building on October 19. On October 21, defendant telephoned plaintiff's employee, Roger Mobeck, and informed him that she intended to again change the locks—which she did the next day. Makris, however, changed the locks back immediately.

On November 7, 1973, plaintiff filed a petition for injunction, alleging that defendant had used vile and abusive language toward plaintiff and had asserted that plaintiff would never operate a restaurant under the lease in question; that defendant caused the facade of the building to be painted without plaintiff's knowledge or permission, and that in the course thereof certain windows were broken; that defendant changed the locks on October 22, shortly after plaintiff had changed the locks to deter defendant from further interfering; and that defendant had engaged in other unreasonable harassing conduct. Plaintiff requested an injunction prohibiting defendant from interfering with its occupancy of the premises. On December 10, plaintiff amended its complaint to add count II for damages, alleging that since the inception of the lease, it had expended $86,000 including rent, as well as $10,000 in attorneys' fees, but had been continuously denied the use and benefit of the lease and incurred expenses because of defendant's harassing conduct. Plaintiff requested damages in the amount of $100,000.

On December 23, defendant in turn filed a counterclaim for damages, alleging that plaintiff removed certain items from the premises, including three air-conditioners, 12 light fixtures, one fireplace, all hardware from doors and closets, certain mahogany paneling, kitchen cabinets, and a 100-year-old tree located in the back yard; that plaintiff's exploratory work caused substantial damage to the premises; that plaintiff failed to initiate its remodeling pursuant to paragraph 20 of the lease; and that plaintiff failed to maintain the premises in a satisfactory state of repair, thus necessitating expenditures on defendant's part for maintenance, for which she asked damages of $14,954 as well as costs and fees.

Plaintiff's count I for injunctive relief went to trial and, on January 17, 1974, in an order reciting a stipulation of the parties that defendant had on "at least one occasion asserted dominion over the premises by causing the property or a portion thereof to be painted without the consent of lessee [plaintiff]," defendant was restrained from interfering with plaintiff's use, occupancy and enjoyment of the premises. Plaintiff's damage count and

defendant's counterclaim were then transferred to the Law Division, where a trial eventually commenced on February 14, 1977, during which plaintiff specified its claim for damages as follows:

| | |
|---|---:|
| "Rent | $45,025.00 |
| Rent Deposit | 9,000.00 |
| Wages—S. Hershman | 5,500.00 |
| Security Service | 1,681.65 |
| Lock changes | 127.50 |
| Auto leasing | 1,445.41 |
| Trademark & Logo | 30.00 |
| Employee payroll tax | 407.03 |
| Architectural service | 11,871.54 |
| Engineering | 288.00 |
| Heat, Electricity, Water | 2,523.86 |
| Real Estate Tax | 2,477.91 |
| Insurance | 2,137.00 |
| Electricity & Gas Deposits | 325.00 |
| Legal Fees | 10,679.80 |
| Maintenance | 2,974.31 |
| Interest on Security Deposit | 984.50 |
| Permit Fee | 274.00 |
| Attorneys' fees for maintenance of action for damages | 15,000.00 |
| TOTAL | $112,752.51" |

This amount represented plaintiff's expenditures from the beginning of the lease term to the date of the injunction entered January 17.

After all evidence was presented, an order was entered awarding plaintiff damages of $89,855.24 and attorneys' fees of $10,000 for the trial of the damage count. The court also found against defendant in her counterclaim. Defendant's post-trial motion to vacate the order and enter judgment in her favor; or, in the alternative, order a new trial was denied. Defendant appeals from those orders.

OPINION

I.

■■ Defendant does not deny that there were breaches of quiet enjoyment, but she contends that the damages awarded plaintiff are not

supported by the evidence. The relevant law, although by no means plentiful, is clear. A covenant of quiet enjoyment is implied in all lease agreements. (*Berrington v. Casey* (1875), 78 Ill. 317; *Wade v. Halligan* (1855), 16 Ill. 507.) If the lessor breaches the covenant, the lessee may remain in possession and thus be liable for rent but still maintain an action for damages. (*Keating v. Springer* (1893), 146 Ill. 481, 34 N.E.2d 805.) The measure of damages in such a case is the difference between the rental value of the premises involved and the rent which the lessee has agreed to pay, together with such special damages as may have been directly and necessarily occasioned to the lessee by the lessor's wrongful act. (*Kammerer v. United States Silica Co.* (1915), 196 Ill. App. 527. Also see *Guntert v. City of Stockton* (1976), 55 Cal. App. 3d 131, 126 Cal. Rptr. 690; *Colt Lanes of Dover, Inc. v. Brunswick Corp.* (Del. 1971), 281 A.2d 596; *Barfield v. Damon* (1952), 56 N.M. 515, 245 P.2d 1032; 49 Am. Jur. 2d *Landlord and Tenant* §350 (1970).) Thus, we must examine the wrongful acts of defendant and determine whether they directly and necessarily occasioned the damages awarded, keeping in mind that a trial court's assessment of damages will be set aside only if it is manifestly erroneous. *Vendo Co. v. Stoner* (1974), 58 Ill. 2d 289, 321 N.E.2d 1, *cert. denied* (1975), 420 U.S. 975, 43 L. Ed. 2d 655, 95 S. Ct. 1398; *Schatz v. Abbott Laboratories, Inc.* (1972), 51 Ill. 2d 143, 281 N.E.2d 323; *De Koven Drug Co. v. First National Bank* (1975), 27 Ill. App. 3d 798, 327 N.E.2d 378.

In the instant case, the trial court made no findings of fact which would indicate the specific acts of defendant upon which the damage award was based. As defendant pointed out in her brief, plaintiff introduced evidence concerning six instances or courses of conduct which the trial court may have believed breached the covenant of quiet enjoyment.

First, the trial court was apprised of the incident in October 1971, when defendant changed the locks on the building and plaintiff was unable to enter for a period of 21 days. John Polales, an officer of the· plaintiff corporation, and defendant herself testified to this episode.

Second, testimony was adduced that defendant authorized the painting of the facade of the building without plaintiff's knowledge. Makris testified that he visited the premises on October 16, 1973; that he observed a window had been knocked out of the building and broken glass was lying on the stairs; and that he noticed thè facade had been painted. Defendant admitted on cross-examination that she authorized the painting and that she did not seek Makris's permission before so doing.

Concerning a third incident, Makris testified that in response to defendant's interference, he changed the locks to keep her out; that on

October 21, 1973, defendant called another of his restaurants and threatened to again change the locks so that she might gain entrance; that on October 22, defendant did in fact have the locks changed, and that he changed the locks back that same day.

Fourth, testimony was introduced that defendant objected to plaintiff's proposed remodeling plans even though the lease gave her no right of approval, and that these objections delayed plaintiff's renovation of the premises. Makris testified that from what he could recall, defendant objected to the plans "at all times"; that her attorney conveyed her objections to the plans; and that changes were made in the plans to accommodate these objections. Makris was impeached, however, by his deposition in which he stated that he did not recall any objections made by defendant or her agents concerning the final set of plans. Steve Hershman, one of plaintiff's employees, testified also that much work was done on the plans in order to develop "one that would be accepted by Mrs. Wallace." Defendant testified, however, that she never told Makris that he could not proceed with his plans.

Fifth, plaintiff introduced testimony indicating that the violations alleged in defendant's three chancery petitions, none of which were actually proven in any proceeding, did not in fact exist, and that these petitions were not filed in good faith and were intended to harass plaintiff. The first of defendant's petitions, filed April 25, 1972, alleged that plaintiff's proposed plans for remodeling would materially change the facade of the building and that, although plaintiff did not secure defendant's approval for such alterations as required by the lease, it commenced work and destroyed portions of the premises. As to these allegations, Makris and Polales testified that the plans did not call for any alterations to the facade. Makris also testified that, as of the date alleged in the petition, no work had been commenced other than exploratory work. Defendant testified, however, that there was other destruction in addition to the exploratory work. An order was entered on this petition setting forth an agreement by plaintiff to file an indemnity agreement covering any damage which the exploratory work might cause.

Defendant's second petition of September 28, 1972, alleged that plaintiff failed to pay defendant the prorated amount of property taxes due; that plaintiff left the premises unoccupied, thus becoming deteriorated and attracting vandals; that defendant incurred expenses to repair the heating unit; and that by these actions plaintiff breached the lease. Concerning these allegations, Polales testified that a check for the taxes was in fact tendered to defendant, but that he believed she refused tender. He also testified that the plaintiff corporation was in continuous occupancy; that until October of 1971, he inspected the premises daily;

that thereafter, until April of 1972, he visited the premises once or twice weekly; and that after that time he visited the building only four to five times per year because a watch service had been retained to guard the premises. Hershman testified that for a period of nine months beginning in July of 1971, he visited the building at least once daily and that a security service also maintained surveillance of the premises. Roger Mobeck, manager of another restaurant owned by Makris, testified that in the spring of 1973, he visited the building daily to check the lights, temperature, and other security concerns. Makris testified that the building was not unoccupied; that someone was in attendance at all times; that he personally visited the premises two to three times weekly during the "planning stages"; that he hired Central Watch Service to guard the premises until November of 1973, when he hired Mike Alexander to live in the building; that at the date of the petition, the building was not in a deteriorated condition; and that vandals did not frequent the premises. However, William Brady, a heating and air-conditioning contractor hired by Makris, testified that he was at the premises in 1973 and that he did not recall anyone living there. Phillip Keefe, one of Brady's employees, also testified on cross-examination that "[i]t looked like the whole building was vacant." With regard to the repair of the heating unit, Brady testified that it was functional and that he had made all necessary repairs at Makris's direction. Makris also testified that he was not aware of any of the problems with the heating unit which were alleged in defendant's petition and that if any such problems actually existed, he would have been so notified by his employees. As to defendant's allegation that plaintiff breached the lease, Makris and Polales testified that they never received written notice of default as required by paragraph 30 of the lease agreement. No order was entered at any time on this petition of September 28, 1973. Defendant's third petition of June 14, 1973, alleged that plaintiff failed to maintain the premises in an orderly condition, forcing defendant to assume financial responsibility for proper maintenance; that plaintiff failed to proceed with its renovations as it previously represented to defendant; and that by its acts, plaintiff breached the lease. As to these allegations, there was testimony from Polales, Mobeck, and Makris that the premises were in generally good condition. Makris further testified that most of the holes made during the exploratory work had been restored in order to satisfy defendant, although defendant testified that the debris from the borings remained on the premises. Polales also testified that, until the date of this petition, the plaintiff corporation never represented to defendant that renovation would commence at any time after the exploratory work was completed. In addition, Polales and Makris testified that they never received written

notice of default from defendant. No order was ever entered regarding this petition of June 14, 1973.

Concerning the sixth instance of possible breach, plaintiff introduced testimony of defendant's alleged frequent abusive language. Hershman testified that on several occasions, defendant swore that Makris would never build a restaurant on the premises. Lambrecht and Mobeck testified that, in several conversations, defendant advised that "No God damn Greek" was going to operate a restaurant in her building. Makris also testified that at approximately the time when defendant changed the locks in October of 1973, she stated to him and several nearby police officers that "[t]hat Greek bastard will never get a restaurant in my building."

■ In determining whether defendant's breach or breaches of the covenant of quiet enjoyment directly and necessarily occasioned the damages awarded, we are somewhat impeded, as stated above, by the trial court's failure to set forth which of the above acts of defendant constituted breaches. We note, however, that an order was entered on October 29, 1971, in a previous proceeding, requiring defendant to submit keys to the building after she had changed the locks for the first time. Since the trial court in that proceeding felt compelled to enjoin defendant's conduct, we may assume the trial court in the instant proceeding was justified in relying on that conduct as a breach of the covenant of quiet enjoyment. In that incident, plaintiff was locked out of the premises for 21 days. According to the *Kammerer* standard, the damages to be awarded for that act of breach are the decrease in rental value plus such special damages which the acts directly and necessarily occasioned to plaintiff. The decrease in rental value resulting from 21 days of barred entry is 21 days of rent which, as defendant concedes, amounts to $1,050. No special damages appear to stem from this incident. We also note the testimony that defendant caused the facade of the building to be painted in October of 1973 and also changed the locks again at that time was uncontradicted, and that defendant admitted this conduct in her testimony. Thus, the trial court was justified in viewing that episode as a breach and there appears no question that the money plaintiff expended in changing the locks back, amounting to $127.50, was directly and necessarily occasioned by defendant's act.

We do not believe, however, that plaintiff is entitled to further compensatory damages under *Kammerer*, even assuming that the remainder of the alleged misconduct to which plaintiff's witnesses testified constituted a breach of the covenant of quiet enjoyment (and we make no such finding). Plaintiff's remaining enumerated claims for damages, excluding those discussed above which we conclude are substantiated, were as follows:

"( 1) Rent (for the entire lease
period until 1/14/74) $45,025.00
( 2) Rent Deposit 9,000.00
( 3) Heat, Electricity, Water 2,523.86
( 4) Real Estate Tax 2,477.91
( 5) Electricity and Gas Deposits 325.00
( 6) Interest on Security Deposit 984.50
( 7) Wages—S. Hershman 5,500.00
( 8) Security Service 1,681.65
( 9) Auto leasing 1,445.41
(10) Trademark and Logo 30.00
(11) Employee payroll tax 407.03
(12) Architectural Service 11,871.54
(13) Engineering 288.00
(14) Insurance 2,137.00
(15) Maintenance 2,974.31
(16) Permit Fee 274.00"

Items (1) through (6) are expenses arising directly from the fact that plaintiff entered the lease agreement and which were incurred until the date of the injunction entered in Count I. Plaintiff contends that damages for those amounts are justified, because the lease was valueless to it until the injunction was entered and its officers knew for certain that defendant's allegations of breach set forth in its petitions would not be sustained. Items (7) through (16) are amounts which plaintiff expended in furtherance of its proposed restaurant. Plaintiff contends that defendant's acts of harassment prevented it from proceeding with its renovation plans and that it is therefore entitled to damages for these amounts under *Kammerer*.

■ We do not feel that the rental payments and concomitant expenditures enumerated in items (1) through (6) can properly serve as a basis for the damage award in the instant case because the testimony fails to show that plaintiff viewed the lease as valueless, as it contends. Plaintiff conducted exploratory work, developed plans for remodeling and, in June of 1972, secured a permit for renovating the building—which it would not have done had it believed the lease to be worthless. Likewise, plaintiff would not have made expenditures, as it did, for architectural and engineering services, for developing a trademark and logo for the proposed restaurant, and for employing various personnel in connection therewith if it truly felt that its leasehold interest was in jeopardy. Significantly, plaintiff demonstrated no clear intent to abandon the restaurant project until its letter to defendant of September 5, 1973, which was written only a few months before it amended its petition to include

this count for damages. Plaintiff's conduct during the time of the alleged harassment thus indicates that it did not consider the lease as "valueless," and we accordingly hold that on such basis the award of damages for those expenditures enumerated in items (1) through (6) was manifestly erroneous.

We likewise do not feel that the expenses set forth in items (7) through (16) are proper elements of damage, because the evidence demonstrates that plaintiff abandoned its restaurant plans for reasons other than defendant's alleged harassing conduct. We recognize that there was some evidence to indicate that plaintiff changed its design plans in response to defendant's objections. Polales and Hershman both testified that at least some of the changes were made in order to satisfy defendant. We note, however, that paragraph (20) of the lease, which permitted remodeling and alteration, required defendant's consent only to front exterior changes.

In any event, there was also evidence indicating that the changes were necessitated for other reasons. Makris testified that the changes incorporated in the second plan were made in order to revise a center staircase which did not comply with fire codes as originally designed, and that the third and fourth set of plans represented a major attempt to cut costs. He also stated in his deposition that the design changes were not made in response to any objections on defendant's part. Pratt, the architect hired by Makris, also testified that each successive revision was made in an effort to cut costs. But most significantly, the testimony demonstrates that plaintiff ultimately decided to abandon the renovation not because of defendant's alleged harassment, but because of financial difficulties. There was considerable testimony that the cost of financing at that time was prohibitive. Makris testified that there was a large increase in the cost of money in 1973. Polales testified that the delay in the commencement of remodeling was due to "a severe economic recession" and that the "markets for capital were extremely limited, or alternatively, were at cost factors that were prohibitive"; that the mortgage market "had dried up"; that interest rates ran from 15 to 18 percent; and that "construction costs had increased substantially, approximately 10 to 12 per cent per year."

In this regard, it is noted that plaintiff explained to defendant in its letter dated September 5, 1973, that it would not proceed with its renovation because of "the present mortgage market and the cost of financing the proposed construction and remodeling of the building." Further, there was testimony indicating that, due to other investments, Makris was financially overextended and thus forced to abandon the restaurant at 64 East Walton. Makris testified that he purchased land for a new restaurant, "Rascals," in the summer of 1972; that Rascals opened in

the spring of 1973; that the total cost to him for this particular endeavor was approximately $1 million; and that he provided approximately $100,000 in cash and financed the rest through the National Bank of Austin. He further testified that at this same time he was obligated to pay his brother, Peter, $10,000 per month for the purchase of Peter's interest in another restaurant, "The Flame"; that he borrowed part of this money from Exchange National Bank in 1971; and that he was also making payments on other notes that he "had picked up because of land purchases." Most significantly, Thomas Conklin, an attorney who represented Makris's ex-wife in their divorce, testified that he had a conversation with Polales in the summer of 1975 in an effort to ascertain Makris's net worth; that Polales stated that he had advised Makris not to proceed with the restaurant at 64 East Walton because he was financially overextended; that Polales mentioned no reasons other than finances for the failure to renovate the building; and that neither Polales nor Makris ever stated to him that defendant's conduct forced them to cancel the remodeling. We believe that the above testimony clearly demonstrates that plaintiff elected not to build a restaurant at 64 East Walton for reasons unrelated to defendant's alleged misconduct. We accordingly hold that the award of damages for expenditures set forth in items (7) through (16) was manifestly erroneous.

In addition to the above discussed sums, the trial court also awarded plaintiff legal fees of $20,679.80, which represented $10,679.80 for fees incurred in the trial of count I of this proceeding and $10,000 incurred in the trial of count II. An award of legal fees was authorized by paragraph 22 of the lease agreement, which states:

> "*Legal and Similar Expenses*: Lessee or Lessor, as the case may be, shall pay all costs, expenses and reasonable attorneys' fees that may be incurred or paid by the other in successfully enforcing the covenants and agreements in this Lease or in any successful suit for damages wherein Lessee or Lessor, as the case may be, is determined to have defaulted."

Legal fees may not be blindly awarded by a court, however. In *Canham v. Saisi* (1978), 65 Ill. App. 3d 686, 382 N.E.2d 654, this court stated that in setting reasonable attorneys' fees, courts should consider:

> "[T]he nature of the controversy, the question at issue, the significance or importance of the subject matter, the degree of responsibility involved, the standing or skill of the person employed, and the time and labor involved. (*Green v. Green* (1976), 41 Ill. App. 3d 154, 354 N.E.2d 661; *Greenbaum v. Greenbaum* (1973), 14 Ill. App. 3d 217, 302 N.E.2d 165.) The allowance should only be in such amount as will compensate for the services rendered, and must be fair and just to all parties

concerned; namely, the attorney to be compensated, the client, and the person required to make the payment. (*Green v. Green.*) Furthermore, it should appear that the work being compensated for was reasonably required and necessary for the proper performance of the legal services involved in the case. [Citation.]" (65 Ill. App. 3d at 693, 382 N.E.2d at 659 (quoting *Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 582, 373 N.E.2d 576, 579).)

In *Larkin Bank v. Ishak* (1976), 43 Ill. App. 3d 918, 357 N.E.2d 840, the court approved the reasoning in the Florida case of *Lyle v. Lyle* (Fla. App. 1974), 167 So.2d 256, 257, where it was stated:

"As between a lawyer and his client the matter of the fee is one of contract between the two, but a fee to be allowed by the court is something else and must be proved as any other fact, and determined and allowed by the court in its judicial discretion. The Reasonableness [*sic*] of the attorney's fees is not the subject of judicial notice, neither is it to be left to local custom, conjecture or guesswork. Each award must be made on its own merits and should be justified by the circumstances in each particular case." (43 Ill. App. 3d 918, 920-21, 357 N.E.2d 840, 841.)

The *Larkin* court went on to state that such circumstances included "the time expended, the complexity of the issues presented, the work involved and the expertise of the lawyer." (43 Ill. App. 3d 918, 921, 357 N.E.2d 840, 842.) Moreover, the amount of time expended as shown by detailed time records is a factor of great importance in determining reasonable attorneys' fees. *Leader v. Cullerton* (1976), 62 Ill. 2d 483, 343 N.E.2d 897; *Flynn v. Kucharski* (1974), 59 Ill. 2d 61, 319 N.E.2d 1; *Canham v. Saisi; In re Estate of Weber* (1978), 59 Ill. App. 3d 274, 375 N.E.2d 569.

In the case at bar, the only proof offered to establish the reasonableness of the $10,679.80 fee for the trial of count I was a statement by plaintiff's accountant, Spiro Besbekos, that plaintiff was indebted to its attorney for that amount. The record discloses no evidence as to the time expended by counsel, whether the trial court considered the circumstances set forth in *Canham* and *Larkin Bank*, or whether in fact all these fees were incurred with respect to services concerning the trial of count I. The trial court's award of attorneys' fees for the trial of count II was similarly not grounded on sufficient proof. Plaintiff merely listed in its post-trial damages memorandum a claim for $15,000 in legal fees for the trial of count II, and the trial court without comment or explanation awarded $10,000. No evidence whatsoever was introduced to establish the reasonableness of these fees. Thus, the question of attorneys' fees for the trial of counts I and II will be remanded so that the trial court may properly consider the relevant factors set forth in the above cases as well

as determine whether the fees were incurred only with respect to causes wherein plaintiff was successful as provided in paragraph (22) of the lease.

In light of the above, we find that only $1,177.50 in damages, representing $1,050 in rent for 21 days in which plaintiff was locked out and $127.50 for lock changes, was in fact directly and necessarily occasioned by defendant's breach of the covenant of quiet enjoyment; that the remainder of the special damages awarded by the trial court is unsubstantiated in the evidence; and that the question of attorneys' fees be remanded for further consideration.

## II.

Defendant's second contention is that the trial court's finding against her in her counterclaim is against the manifest weight of the evidence. We disagree.

In her counterclaim, defendant alleged that plaintiff removed certain items from the premises, including three air-conditioners, 12 light fixtures, on fireplace, all hardware from doors and closets, certain mahogany paneling, kitchen cabinets and a 100-year-old tree; that plaintiff's exploratory work caused substantial damage to the premises; that plaintiff failed to initiate its remodeling pursuant to paragraph 20 of the lease; that plaintiff failed to maintain the premises in a satisfactory state of repair, thus necessitating expenditures on defendant's part to make the repairs; and that therefore defendant is entitled to damages of $14,954, as well as costs and fees.

Most of the evidence introduced by defendant in support of her counterclaim concerned the condition of the premises during the lease term. Henry Mikolajczyk, a professor of architecture at the University of Illinois, testified that numerous photographs of the premises submitted into evidence by defendant depicted violations of the Chicago Building Code in that holes in the walls and loose plaster were evident. On cross-examination, he testified that he toured the premises and that some of the holes depicted in the photographs may have been recovered; that boring holes in walls is a common method of conducting exploratory work; that at least some of the holes appeared to have been strategically placed in the course of such exploratory work and that some of the plaster depicted in the photographs may have been present for 5 or 10 years. Edward Kosinski, an employee of the Insurance Company of North America, testified that he inspected the property for various risks in late 1973 in connection with an insurance policy; that he observed debris and loose plaster on the premises; that the rear porch of the building was in poor condition; and that he had rated the building as "somewhat hazardous," possessing "a potential for creating serious damage." On cross-

examination, however, he testified that the condition of the porch appeared as though it had developed over 15 or 20 years. Harold Grant, manager of Acme Window Cleaning, testified that he visited the premises in 1973 at defendant's request in order to quote a price for cleaning the windows, and that the windows were so dirty he charged double his usual fee. On cross-examination, he stated that the windows probably had not been cleaned in at least three years—and possibly longer. William Yarbrough and Roger DeKind, maintenance personnel hired by defendant, also testified that the premises were in generally poor condition. Finally, defendant testified rather confusingly that Mr. Goldberg, a contractor apparently hired by her or her nephew, removed the paneling but that it was somehow discarded, contrary to her desires; that some air-conditioners were removed from the premises, although she did not specify by whom; that some brass knobs were missing from cabinets, but that her attorney helped her remove the knobs; and that a 100-year-old tree was removed from the yard.

In plaintiff's behalf, Polales and Makris testified initially that they never received notice of default under the lease for any of the violations alleged in defendant's counterclaim. As to the condition of the building, Mobeck testified that he was present when a building inspector examined the premises at defendant's request in the summer of 1973; that he was never notified that any violations were found; that he was also present when a fire inspector examined the building; and that he never received notice that any fire code violations existed. Mobeck also testified, as did Makris, that most of the test borings had been recovered and loose plaster cleared. Polales testified that no one associated with plaintiff removed any property from the building; and Mobeck explained further that defendant herself requested her serviceman to remove the brass plates from the doors in the building. In addition, Makris testified that he did not remove any air-conditioners and knows of no one who did; that most of the fireplace is still intact, although part of it is missing; that he neither removed nor authorized the removal of that part; and that defendant herself removed the paneling. Concerning the removal of the 100-year-old tree, Makris admitted that he in fact authorized removal of the tree. However, Polales explained that while the original draft of the rider to the lease agreement prohibited the removal of trees on the premises, the parties agreed to strike that clause before they executed the agreement. A copy of the lease, admitted into evidence, reveals that this clause was interlineated and that defendant's and Makris's handwritten initials appear nearby.

■■ In light of the above, we do not believe that the trial court's finding in favor of plaintiff on defendant's counterclaim is against the manifest weight of the evidence. We note initially that defendant failed to serve

notice of default on plaintiff as required by paragraph 30 of the lease and thus cannot institute this counterclaim and remain in compliance with the terms of the agreement. Furthermore, defendant's counterclaim appears to fail on the merits. As to allegations that plaintiff misappropriated certain fixtures, the testimony indicates that these items are either not missing at all or were removed at defendant's own direction. Concerning charges that plaintiff failed to maintain the premises, the evidence is conflicting as to whether any ordinance violations existed. The testimony indicates that the poor appearance of the premises was due primarily to legitimate exploratory work which did not violate the lease agreement and most of which may have been recovered. Other maintenance problems may well have existed prior to the inception of the lease, before plaintiff took possession. In view of the above, we cannot say that the trial court's finding was against the manifest weight of the evidence.

The damages awarded plaintiff are reduced to $1,177.50; the question of attorneys' fees to be awarded plaintiff is remanded for further proceedings consistent with this opinion; and the finding against defendant in her counterclaim is affirmed.

Affirmed in part.

Modified in part.

Reversed in part and remanded.

LORENZ and WILSON, JJ., concur.