Carol Ann **BOCCHINI**

v.

**GORN MANAGEMENT COMPANY, et al.**

**No. 136, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Oct. 14, 1986.

2

Carlos M. Recio (Moran & Pilger on the brief), Washington, D.C., for appellant.

Kristine A. Crosswhite (James R. Eyler, Miles & Stockbridge, Stuart L. Sagal and Bass & Denick, P.A., on the brief), Baltimore, for appellees.

Argued before WILNER, ROSALYN B. BELL and WENNER, JJ.

WILNER, Judge.

Fed up with the noise from her upstairs neighbors and her landlord's apparent unwillingness to do anything to stop it, Carol Bocchini and her young daughter vacated their apartment at 5718–5C Plainfield Avenue on August 8, 1985. The landlord's agent, Gorn Management Company, believed the departure to constitute a breach of Ms. Bocchini's lease and so filed suit against her in the District Court, seeking lost rent, other damages, and attorney's fees.

By praying a jury trial, Ms. Bocchini caused the case to be removed to the Circuit Court for Baltimore County, where she filed a counterclaim against the agent and the two alleged owners of the apartment, Samuel and Morton Gorn.[1] The counterclaim contained five counts: Breach of a covenant of quiet enjoyment and constructive eviction (Count I); Negligence (Count II); Deceit (Count III); Nui-

---

1. Liability on the part of the Gorns individually was apparently premised on their derivative responsibility for the acts and omissions of their managing agent. That issue was not decided below and is not now before us. For convenience, we shall refer to "Gorn" or "landlord" in the singular. All of the pertinent accusatory averments were directed against the agent, Gorn Management Co.

sance (Count IV); and Breach of Md.Code Ann. Real Prop.
art., § 8–203(c), dealing with security deposits (Count V).
The court granted the landlord's motion to dismiss Counts I
through IV, apparently on the ground that they failed to
state a claim upon which relief can be granted, determined
that there was no just reason for delay, and entered judg-
ment in favor of the landlord on those counts. See Md.Rule
2–602. Count V remains undecided; this appeal by Ms.
Bocchini is from the judgments entered on the first four
counts.

The facts pled in support of Counts I–IV were essentially
these. Ms. Bocchini rented the apartment in February,
1978. In the fall of 1979, the Seaberrys moved upstairs,
into apartment 5–E. In 1983, the Seaberrys separated;
thereafter, Mrs. Seaberry began to keep company with a
Mr. McClean, who became a frequent visitor at Mrs. Seaber-
ry's apartment and, in June, 1985, actually moved into the
apartment. There was no carpeting in the Seaberry apart-
ment, and, while Mr. McClean was present, there would be
"unbearable" noise coming from it. The noise consisted of
"clomping on the floor from persons walking or running
heavily, exercising taking place on the floor, a very loud
alarm clock going off at approximately 5:00 a.m., and play-
ing the stereo extremely loudly at late hours."

After making "repeated efforts" to resolve the problem
with Mrs. Seaberry, Ms. Bocchini, in April, 1984, complained
to Gorn, informing it that the noise "continued unabated
and that it was impossible for her and her daughter to get
adequate sleep or quietly enjoy the premises they had
rented." At one point, the noise caused Ms. Bocchini and
her daughter to sleep at a neighbor's house. Eventually,
after several communications by Ms. Bocchini, Gorn ac-
knowledged the problem and promised to take some action.
On two occasions, once in May and once in June, it appar-
ently wrote to Mrs. Seaberry, informing her of Ms. Bocchi-
ni's complaint, but the letters had no effect; the problem
continued—"stomping on the floors at unreasonable hours,
such as 12:30 and 2:30 in the morning, loud music, the

banging of doors, yelling and banging on the walls." Ms. Bocchini wrote to Gorn on June 18, 1984, and again on July 9. In a subsequent telephone conversation, Gorn said that it was "not going to take any action regarding the problem."

On July 31, 1984, Ms. Bocchini was unable to get to sleep until after midnight because of the "clomping and banging on the floor over her bedroom"; the noise began again at 5:45 a.m. As Ms. Bocchini was leaving her apartment later that morning, McClean shouted obscenities at her and actually threatened her. Ms. Bocchini complained of that as well, but again Gorn refused to take any action. On August 2, she and her daughter, exhausted and in fear, moved in with friends; six days later, upon the advice of her physician, they permanently vacated the apartment.

Those averments, as we said, are common to all four counts at issue here. Additional allegations more specifically related to the respective causes of action also appear, but we shall consider them as part of our discussion of the individual counts.

## I. *Quiet Enjoyment/Constructive Eviction*

In Count I, Ms. Bocchini alleged that Mrs. Seaberry's lease "included a clause against excessive noise" as well as one "barring unauthorized persons from living in the apartment." Her action was based in large part upon the landlord's refusal to enforce those provisions.[2] She claimed further that the landlord's failure to take positive action to move her to another apartment or, after informing Mrs. Seaberry about Ms. Bocchini's complaints, to evict Mrs. Seaberry or Mr. McClean "ratified and encouraged the behavior of the upstairs tenants."

The landlord defends this Count on two bases. First, it contends that the common law implied covenant of quiet

---

2. Ms. Bocchini also complained of the landlord's refusal to promulgate regulations requiring carpeting in the upstairs apartments, although there is no allegation that the landlord had reserved the right to adopt such regulations.

enjoyment, upon which Ms. Bocchini relies, is not applicable to residential leases but affects only commercial leases. The sole right of quiet enjoyment applicable to residential leases, it continues, is that provided by Md.Code Ann. Real Prop. art., § 8–204(b), which merely assures that a tenant may peaceably and quietly enter the leased premises "at the beginning of the term of any lease." That provision, it argues, does not apply to a situation occurring *after* the tenant has already entered into possession under the lease; hence, no covenant, no breach, no constructive eviction.

The landlord's second line of defense is that, even if the general implied covenant is applicable to residential leases, (1) it is not violated when the disturbance is caused by other tenants, and (2) in any event, Ms. Bocchini's remedy lies solely under the Baltimore City rent escrow law.

We reject both lines of defense.

### A. *Implied Covenant Of Quiet Enjoyment and § 8–204(b)*

In *Baugher v. Wilkins*, 16 Md. 35 (1860), the Court of Appeals recognized as a matter of common law

"that a lessee who holds under one who has a fee in the premises demised, is entitled to the quiet enjoyment of them during *his term,* and there is an implied covenant to that effect on the part of the lessor in the case where none is expressed, if the contrary be not stated."

*Id.,* 44–45 (emphasis in original). The covenant "insulates the tenant against acts or omissions on the part of the landlord, or anyone claiming under him, which interfere with the tenant's right to the use and enjoyment of the premises for the contemplated purposes." *Q C Corporation v. Maryland Port Administration,* 68 Md.App. 181, 510 A.2d 1101 (1986), *petition for cert. filed,* No. 337, S.T. 1986, August 15, 1986, quoting 3 G. Thompson, *Thompson on Real Property,* § 1130, p. 456 (1980 Repl.Vol.). *See also* 1 H. Tiffany, *The Law of Real Property,* 3d ed., § 91, p. 137 (1939).

Despite the assertions of the landlord in this case, we find nothing in the case law or the literature to suggest that this common law implied covenant did not apply to residential leases. Indeed, the law seems to be quite to the contrary. The general rule expressed by the courts is that a covenant of quiet enjoyment is implied in *every* lease, absent some provision in the lease negating such an implied covenant.[3] *See Western Stock Center, Inc. v. Sevit, Inc.*, 195 Colo. 372, 578 P.2d 1045 (1978); *Pollock v. Morelli*, 245 Pa.Super. 388, 369 A.2d 458 (1976); *Smith v. Hightower*, 80 Ga.App. 293, 55 S.E.2d 872 (1949); *64 East Walton v. Chicago Title & Trust Co.*, 69 Ill.App.3d 635, 25 Ill.Dec. 875, 387 N.E.2d 751 (1979); *Stewart v. Murphy*, 95 Kan. 421, 148 Pac. 609 (1915); 51C C.J.S., *Landlord & Tenant*, § 323(1), p. 831 (1968). Tiffany observes that the covenant is implied "from the mere relation of landlord and tenant...." H. Tiffany, *supra*, § 91, p. 138. *See also Duncklee v. Webber*, 151 Mass. 408, 24 N.E. 1082 (1890), where such a covenant was implied in a residential lease.

That clearly is the law in Maryland. In 1971, the General Assembly codified some of the common law relating to property, including the common law implied covenant of quiet enjoyment. By 1971 Md.Laws, ch. 649, it added as new § 94A to then-art. 21 of the Code:

"There shall be no implied covenant or warranty by the grantor as to title or possession in any grant of land or of any grant of an interest or estate in land except that *in any lease*, unless the lease provides otherwise, there shall be an implied covenant by the lessor, his personal representatives and assigns that the lessee, his personal representatives and assigns shall quietly enjoy said land."

(Emphasis added.)

That provision, sanitized a bit as to style through the Code-revision process, now appears as § 2–115 of the Real

---

**3.** An implied covenant, it would appear, may be negated either by a disavowal of such a covenant or by the inclusion of an express covenant of quiet enjoyment. *Cf. Morris v. Harris*, 9 Gill 20, 27 (1850).

Property article. It is part of title 2 of the article, containing rules of construction applicable throughout the whole of the Real Property article, and provides:

"There is no implied covenant or warranty by the grantor as to title or possession in any grant of land or of any interest or estate in land. However, in a lease, unless the lease provides otherwise, there is an implied covenant by the lessor that the lessee shall quietly enjoy the land." [4]

This statute, both from its wording and from its purpose as a mere codification of the common law principle, applies to every lease, including residential leases.

Section 8–204(b) in no way detracts from or circumscribes § 2–115. Indeed, its purpose was to extend, rather than restrict, the general implied covenant of quiet enjoyment. As noted, the Court in *Baugher v. Wilkins* stressed that the covenant protected a tenant only during the term of the lease. Thus, as a general rule, the covenant was not breached by a failure to deliver the premises at the beginning of the term. *Sigmund v. Howard Bank*, 29 Md. 324 (1868). Section 8–204(b) addresses that situation. Enacted in 1972 (1972 Md.Laws, ch. 573), it emanated from the Governor's Commission on Landlord-Tenant Law Revision which, in its 1972 Report to the Governor, characterized the proposal thusly:

"The Commission also has *extended* the doctrine of quiet enjoyment of the premises to require the landlord to deliver the leased premises to the tenant at the beginning of the term. Presently, if the prior tenant holds over, it is the responsibility of the incoming tenant to evict him. This would place the burden on the landlord to evict the tenant who is holding over.

Copies of the bills in legislative form are attached." (Emphasis added.)

Count I, then, is governed by § 2–115, not by § 8–204(b).

---

4. "Land," as used in the article, has the same meaning as "property" (Real Prop. art., § 1–101(f)), and "property" means "real property or any interest therein or appurtenant thereto" (§ 1–101(k)).

B. *Conditions Caused By Other Tenants—Remedy*

We turn then to the landlord's second line of defense, which, as noted, is a bipartite one.

■ Preliminarily, the landlord asks us to dismiss, offhand, Ms. Bocchini's averment that the Seaberry lease contained restrictions against excessive noise and unauthorized residents because the entire lease is not in the record. We reject that entreaty. To withstand a motion to dismiss for failure to state a claim, a complaint does not have to be supported by extrinsic evidence. In judging its legal sufficiency, we assume the truth of all relevant and material facts that are well-pleaded and all inferences that can be reasonably drawn from the complaint. *Sharrow v. State Farm Mutual Automobile Insurance Co.*, 306 Md. 754, 511 A.2d 492 (1986). Ms. Bocchini's averment that the Seaberry lease contained the restrictions noted suffices at this point.

Acknowledging that some courts, in what it regards as distinguishable circumstances, have held to the contrary, the landlord argues that a breach of a covenant of quiet enjoyment and a constructive eviction cannot be based upon disturbances caused by another tenant. Secondarily, it contends that, even if such a breach or eviction could be premised on the actions of another tenant, Ms. Bocchini's sole remedy lies under the Baltimore City rent escrow law (Public Local Laws of Baltimore City, §§ 9–9 and 9–9A).[5]

(i)

On the principal argument that a landlord cannot be held to have breached a covenant of quiet enjoyment or to have constructively evicted a tenant because of conditions created by another tenant, the law seems to be in a state of flux and disarray. The traditional view, well summarized by R. Schoshinski, *American Law of Landlord and Ten-*

---

**5.** Ms. Bocchini alleged that the apartments at 5718 Plainfield Avenue were in Baltimore City. She claimed that she was a resident of Baltimore County but made no allegations as to the residence or place of business of any of the defendants. The landlord's rent action was filed in Baltimore County, as was the counterclaim.

*ant,* § 3:7 (1980), is as espoused by the landlord—that a landlord

> "is not responsible for the activities of his tenants. The mere existence of a legal relationship between landlord and tenant is not sufficient to impose a duty on the landlord concerning tenant conduct. The test is frequently fashioned to require both the landlord's knowledge and permission or authorization of the conduct before it will be attributable to him."

*See also* Annot., *Breach of covenant for quiet enjoyment in lease,* 41 A.L.R.2d 1414, 1441 (§ 22) (1955).

That rule, still followed by a number of courts, was never universal and, in more recent times, has been increasingly abandoned. *See, for example,* the later Annotation, *Landlord and Tenant: Constructive Eviction By Another Tenant's Conduct,* 1 A.L.R.4th 849, 854, 859–62 (1980). The Restatement (Second) of Property, § 6.1 (1977), adopts the more recent view. Section 6.1 provides, in relevant part, that, absent some contrary agreement, "there is a breach of the landlord's obligations if, during the period the tenant is entitled to possession of the leased property, the landlord, *or someone whose conduct is attributable to him,* interferes with a permissible use of the leased property by the tenant." (Emphasis added.) In comment d to § 6.1, the point is made that, "The conduct of a third person outside of the leased property that is performed on property in which the landlord has an interest, *which conduct could be legally controlled by him,* is attributable to the landlord for the purposes of applying the rule of this section." (Emphasis added.)

Illustration 11 under that comment presents precisely the circumstances pled in this case:

> "L leases an apartment to T. L leases another apartment in the same building to A. Under the terms of each lease, L reserves the right to terminate the lease if a tenant persists in making noises disturbing to other tenants after being requested to stop the disturbing noises. T

complains to L about disturbing noises of A and L refuses to do anything. The noises of A are attributable to L for the purposes of applying the rule of this section."

For cases finding a breach of a covenant of quiet enjoyment or a constructive eviction based on disturbances by another tenant where the landlord has some measure of control over the offending tenant, see *Colonial Court Apartments, Inc. v. Kerr,* 282 Minn. 533, 163 N.W.2d 770 (1968); *Home Life Ins. Co. v. Breslerman,* 168 Misc. 117, 5 N.Y.S.2d 272 (1938); *Cohen v. Werner,* 85 Misc.2d 341, 378 N.Y.S.2d 868 (1975); *Blackett v. Olanoff,* 371 Mass. 714, 358 N.E.2d 817 (1977); *Eskanos and Supperstein v. Irwin,* 637 P.2d 403 (Colo.Ct.App.1981); *Gottdiener v. Mailhot,* 179 N.J.Super. 286, 431 A.2d 851 (App.Div.1981); *Bruckner v. Helfaer,* 197 Wis. 582, 222 N.W. 790 (1929); *Hannan v. Harper,* 189 Wis. 588, 208 N.W. 255 (1926).

It does not appear that the appellate courts of Maryland have yet addressed this question precisely.[6] Subject to review by the Court of Appeals, we may therefore elect to follow either the more traditional view, declining to attribute the sins of the tenant to the landlord, or what seems to be the more modern view articulated in the Restatement, comment d and Illustration 11. We think that the latter is more appropriate.

The traditional view rests essentially upon the notion that a landlord should not be responsible for the actions of persons over whom he has no control. In the older cases, tenants were treated much the same as trespassers or other strangers in that regard; unless the landlord in some way authorized or sanctioned the offensive conduct, he would not be held liable for it.

---

**6.** In *QC Corporation v. Maryland Port Administration, supra,* 68 Md. App. 181, 510 A.2d 1101, we found a breach of an implied covenant of quiet enjoyment and a constructive eviction arising from polluting activities carried on by the landlord through a lessee. The issue presented here, however, was not argued in that case or directly addressed in our opinion.

■ Our concern is not with the underlying principle but rather with its application. The more recent cases dwell not so much on whether the landlord has *approved* the conduct of the tenant as whether he is in a position to *correct* or *terminate* it. Where, through lease provisions or otherwise, he has that ability, the thought is that he ought not to be able to escape his obligation under a covenant of quiet enjoyment by steadfastly refusing to exercise his authority.

We adopt that view. It is fair and it is reasonable. The insertion in a lease of a restriction against excessive noise or other offensive conduct is precisely for the purpose of enabling the landlord to control that conduct. Its principal function—at least in a multi-unit apartment lease—is to protect the right of other tenants to the quiet enjoyment of their homes by allowing the landlord to evict a tenant who transgresses upon that right. *Compare Parklawn v. Nee,* 243 Md. 249, 253, 220 A.2d 563 (1966), holding that a landlord is not liable for a nuisance created and maintained by his tenant when the landlord "does not have the ability to do anything to abate the nuisance during the tenant's term."

Upon this view, we believe that Ms. Bocchini has sufficiently pled a breach of the now-statutory implied covenant of quiet enjoyment leading to a constructive eviction.[7]

(ii)

■ With the benefit of neither authority nor persuasive logic, the landlord argues that, even if Ms. Bocchini has sufficiently pled a case of breach of covenant or construc-

---

7. Because Ms. Bocchini did, in fact, vacate the apartment, allegedly as a direct result of the circumstances constituting the breach of the covenant, we need not dwell on the relationship between these two concepts—breach of the covenant and constructive eviction. We have defined a constructive eviction as occurring when a landlord, with the intent of depriving the tenant of the use and enjoyment of the demised premises, acts in such manner as to cause serious or substantial interference with the tenant's enjoyment of the property and results in the tenant vacating the property. *See Stevan v. Brown,* 54 Md.App. 235, 240, 458 A.2d 466, *cert. denied* 297 Md. 110 (1983).

tive eviction, her sole remedy lies under the rent escrow provisions of §§ 9–9 and 9–9A of the Code of Public Local Laws of Baltimore City. We see no merit whatever to that view.

Section 9–9 was designed to deal with structures that are "substandard with respect to structure, equipment or maintenance" § 9–9(a). It allows the escrowing of rent when there exists a condition that does or will

"constitute a fire hazard or serious threat to the life, health, or safety of occupants ... including ... a lack of heat or of hot or cold running water ... or of light or of electricity or of adequate sewage disposal facilities or an infestation of rodents ... or of the existence of paint containing lead pigment within the dwelling ..."

§ 9–9(b). Section 9–9A permits similar escrowing of rent where

"there exists on the leased premises a condition which constitutes a material noncompliance by the landlord with the written lease or a condition which constitutes a repudiation of a written inducement to rent the premises, such as ...

(1) Lack of functional and sufficient laundry, cooking, or dishwashing facilities;

(2) Lack of functional refrigeration or air conditioning;

(3) Lack of proper maintenance; or

(4) Lack of specified recreational facilities."

Assuming, *arguendo*, that the condition pled by Ms. Bocchini—excessive and incessant noise—falls within the ambit of either section, we find nothing in those sections purporting to make the rent escrow remedy an exclusive one. Indeed, the law is couched in terms of what the tenant "may" do when faced with the circumstances mentioned in the statute, not what he "must" do. *See* § 9–9(b) and (c); § 9–9A(a). We made clear in *Stevan v. Brown, supra,* 54 Md.App. 235, 242, 458 A.2d 466, that, while "commonly raised as a defense to a landlord's action for rent ...[,] constructive eviction may provide a litigant with a sword, as

well as a shield." We observed that other courts have allowed constructively evicted tenants to recover moving expenses, lost profits, attorney's fees, and other past and future damages, and we concluded, in that case, that the tenant could recover for a renewal term lost by reason of the constructive eviction. We quoted, with tacit approval, from *Weighley v. Muller*, 51 Pa.Super.Ct. 125, 132 (1912):

> "If the tenant was evicted by the landlord or by acts equivalent to an eviction was deprived of his pecuniary interest under the lease, he was entitled to recover as damages the loss suffered by him—to be put in the same position pecuniarily as he would have been if the contract had been kept—when the damages are the natural result of such breach of contract and can be ascertained with reasonable certainty."

We shall not lightly assume from the enactment of §§ 9–9 and 9–9A an intent by the Legislature to abolish or restrict the common law right to damages. Indeed, "[i]t is presumed that the legislative body did not intend to make any alteration of the common law other than what is plainly stated." *Bradshaw v. Prince George's County*, 284 Md. 294, 302, 396 A.2d 255 (1979); *Hardy v. State*, 301 Md. 124, 131, 482 A.2d 474 (1984). We therefore conclude that the trial court erred in dismissing Count I.

## II. *Negligence*

Count II of the counterclaim is captioned "Negligent Infliction of Mental Distress." The text of the Count charges that the landlord failed to act reasonably under the circumstances and "violated the standard of care that a reasonable and prudent landlord in the same or similar conditions would have followed." Ms. Bocchini alleges that the duties breached by the landlord "included duties arising by law out of the landlord/tenant relationship, as well as duties created by representations of [the landlord] that [it] would take action to solve the problem created by the upstairs tenants." As a result of this negligence, according to her amended counterclaim, Ms. Bocchini and her daugh-

ter were allegedly caused "stress, anxiety, severe mental suffering and distress resulting in clearly apparent and substantial physical injuries capable of objective determination." [8]

Notwithstanding the caption, we read Count II, as amended, as attempting to charge the landlord with simple negligence in failing to take some action against Mrs. Seaberry as required by its covenant of quiet enjoyment and as it promised to do, from which mental and physical injury resulted.

In support of this Count, Ms. Bocchini cites cases involving dangerous nuisances maintained by a tenant (*Moretti v. C.S. Realty Co.*, 78 R.I. 341, 82 A.2d 608 (1951)); attacks on tenants or other persons by vicious dogs or people (*Siegel v. 1536–46 St. John's Place Corporation*, 184 Misc.2d 1053, 57 N.Y.S.2d 473 (1945); *Samson v. Saginaw Professional Building, Inc.*, 393 Mich. 393, 224 N.W.2d 843 (1975); *Sinai v. Polinger Co.*, 498 A.2d 520 (D.C.1985); *Scott v. Watson*, 278 Md. 160, 359 A.2d 548 (1976)); or dangerous conditions in or about the premises (*Brown v. Maxey*, 124 Wis.2d 426, 369 N.W.2d 677 (1985); *Whitlock v. University of Denver*, 712 P.2d 1072 (Colo.Ct.App.1985), *cert. granted* (1986)). That is not the situation pled in Count II, however, and we do not believe that liability under that Count can be based on the holdings in those kinds of cases.

The right of quiet enjoyment is a contractual right. Though arising from the landlord/tenant relationship and imposed by law, it has always been regarded as a *covenant*, implied in the *lease*, and not some inherent property right that settles on a tenant *qua* tenant, without regard to the

---

**8.** While recognizing that "negligent infliction of mental distress" does not exist as a cause of action in Maryland, *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 502 A.2d 1057, *cert. denied* 306 Md. 118, 507 A.2d 631 (1986), we hasten to point out that "[a] plaintiff may maintain an action for damages for a negligent act which causes nervous shock resulting in clearly apparent and substantial physical manifestations." *McCance v. Lindau*, 63 Md.App. 504, 513, 492 A.2d 1352 (1985).

lease. The "duty" to honor and enforce the covenant, it seems to us, is also a contractual one. The question, then, is whether an action in tort will lie for the nonperformance of a contractual duty (and, if so, whether Ms. Bocchini has sufficiently pled such an action).

There may have been some time in the pristine past when contracts were contracts and torts were torts and the lines of demarcation between them were clear. For good or ill, that is not the case now. It has long been recognized, for example, that defective performance of a contractual undertaking may give rise to an action in both tort and contract. *See, in general,* Prosser and Keeton, *The Law of Torts,* 5th ed., pp. 660–67 (1984). The Court of Appeals seemed to recognize in *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. 192, 278 A.2d 12, *cert. denied* 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971), and *H & R Block, Inc. v. Testerman,* 275 Md. 36, 48, 338 A.2d 48 (1975), that an action in tort may lie for "negligent breach of contract." *See also* Restatement (Second) of Torts, § 323 (1966), predicating tort liability on the negligent performance of an undertaking to provide certain services. Note, in particular, comment d to § 323.

Although tort liability based on breach of a contractual undertaking was once limited to cases of defective or negligent performance—i.e., a performance actually undertaken but carried out badly or incompletely—some courts have applied it in cases of nonperformance as well. *See, for example,* 57 Am.Jur.2d, *Negligence,* § 47, p. 396 (1971); also, Restatement (Second) of Torts, § 357, adopting what it concedes is a minority rule that a landlord may be liable in tort for breach of a covenant to repair. *See also* R. Schoshinski, *American Law of Landlord and Tenant, supra,* § 4:5, p. 194, (indicating that the Restatement view represents a "modern trend"), *but compare* Prosser and Keeton, *supra,* p. 660, (suggesting that there is "a valid line between the complete nonperformance of a promise, which in the ordinary case is a breach of contract only, and a defective performance, which may also be a matter of tort.").

The Restatement view finds some support in Maryland law. In *Thompson v. Clemens,* 96 Md. 196, 208, 53 A. 919 (1903), the Court declared that "when a landlord has agreed to make repairs there is a *duty* resting on him to do so, and upon his failure the tenant may either sue on his contract or bring an action on the case founded in tort for neglect of that duty." (Emphasis in original.) That still represents the law in this State. *See McKenzie v. Egge,* 207 Md. 1, 7, 113 A.2d 95 (1955); *Ensor v. Ortman,* 243 Md. 81, 220 A.2d 82 (1966).

■ It would seem, therefore, at least when it comes to a promise to repair, that the line between misperformance (misfeasance) and nonperformance (nonfeasance) has certainly been blurred, if not indeed erased. While we recognize that, historically, the law with respect to repairs has taken a somewhat different course than that regarding the covenant of quiet enjoyment, in today's setting, we see no good reason to treat one promise differently than the other.[9] The breach of either can not only seriously interfere with the tenant's enjoyment of his property but also create a risk of pecuniary and personal injury. We therefore conclude that an action in tort can lie for the negligent performance or the negligent nonperformance of a covenant of quiet enjoyment. But has Ms. Bocchini adequately pled such an action?

---

**9.** Under traditional common law principles, a landlord had no duty to make repairs; there was no implied covenant in that regard. *See Miller v. Howard,* 206 Md. 148, 154, 110 A.2d 683 (1955); *Woodcock v. Pope,* 154 Md. 135, 146, 140 A. 76 (1928). An action for failure to repair had to rest on an express promise by the landlord, but even where such a promise was made, an action in *assumpsit* was not always possible or satisfactory. Even if the tenant could prove the requisite consideration for the promise, the harm was often in the form of personal injuries, and damages on a breach of contract theory might be inadequate. Extension of tort liability in that setting—holding the landlord liable for the consequences of his negligent failure to carry out his promise—served a useful social purpose. *See* Prosser and Keeton, *supra,* pp. 443–44.

Though recognizing the tortious nature of negligent nonperformance of a promissory or contractual undertaking, the *Thompson v. Clemens* Court made clear that, to recover, the tenant must plead and show "some clear act of negligence or misfeasance on the part of the landlord beyond the mere breach of contract." Merely alleging that the landlord "had negligently failed" to carry out his promise is not enough. 96 Md. at 208–09, 53 A. 919. The negligence, and not just the breach, "must be clearly established as the foundation for such liability...." *Id.*, 211, 53 A.2d 919.

■ That, we think, is where Count II is deficient. It has the right "buzzwords"—negligent, duty, reasonable—but it fails to state how and why the landlord's reticence to act was negligent. Putting aside the legal jargon, Ms. Bocchini really does no more than to charge that the landlord had a duty to control the excessive noise emanating from the Seaberry apartment, that it failed to do so, and that its failure was negligent. That is not sufficient. We therefore conclude that Count II does not state a claim upon which relief can be granted and that its dismissal was proper.

### III.  *Deceit (Fraud)*

Count III, captioned "Deceit," alleges that the landlord represented that it would take action against the upstairs tenant, that the representation was false or was made with such reckless indifference to the truth that it would be reasonable to charge the landlord with knowledge of its falsity, that the landlord had no intention of doing anything about the problem and in fact did nothing about it, that the landlord made the representation intending that Ms. Bocchini would rely on it and remain in the apartment, and that she did reasonably rely on it. As a result of her reliance, she suffered anxiety, mental distress, and loss of time from work.

Like Count II, this Count is founded on the landlord's promise to perform its underlying contractual obligation,

and the gravamen of the action is its failure to do so. Count II asserts that the failure was negligent; Count III claims it was deliberate—that the landlord never did intend to perform. The question then is raised whether an action in deceit/fraud will lie in such a circumstance and, as with Count II, if so, whether Ms. Bocchini has sufficiently pled such an action.

As has been stated many times, for a plaintiff to recover in an action in deceit, it must be shown:

"(1) that the representation made is false; (2) that its falsity was either known to the speaker, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of defrauding the person claiming to be injured thereby; (4) that such person not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that he would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that he actually suffered damage directly resulting from such fraudulent misrepresentation."

*See Martens Chevrolet v. Seney,* 292 Md. 328, 333, 439 A.2d 534 (1982).

It has long been recognized that "[a] promissory representation made with an existing intention not to perform is actionable for fraud," i.e., that such a representation is regarded as one of present fact rather than of future possibility. *Sims v. Ryland Group, Inc.,* 37 Md.App. 470, 472, 378 A.2d 1 (1977). *See also* Restatement (Second) of Torts, § 530(1). "A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention." The Restatement, indeed, is instructive in terms of what is before us. Comment c to § 530(1) states:

"The rule stated in this Section finds common application when the maker misrepresents his intention to perform an agreement made with the recipient. The intention to

perform the agreement may be expressed but it is normally merely to be implied from the making of the agreement. Since a promise necessarily carries with it the implied assertion of an intention to perform it follows that a promise made without such an intention is fraudulent and actionable in deceit under the rule stated in § 525. This is true whether or not the promise is enforceable as a contract. If it is enforceable, the person misled by the representation has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract. If the agreement is not enforceable as a contract, as when it is without consideration, the recipient still has, as his only remedy, the action in deceit under the rule stated in § 525. The same is true when the agreement is oral and made unenforceable by the statute of frauds, or when it is unprovable and so unenforceable under the parol evidence rule. The tort action may have other advantages, as when it is subject to a longer statute of limitations. In all of these cases, it is immaterial to the tort liability that the damages recoverable are identical with, or substantially the same as, those which could have been recovered in an action of contract if the promise were enforceable."

The "common application" noted in the comment would seem to refer to situations where the plaintiff has been induced to enter into an agreement by the promise rather than situations where an existing contractual relationship exists and one party simply, but falsely, promises to fulfill the obligations he has already undertaken. Cases involving the former are legion; we are unaware of any involving the latter. Indeed, to extend an action of deceit to the latter situation would be tantamount to allowing punitive damages in what essentially are breach of contract actions, something the Court of Appeals has been reluctant to do absent a showing of actual malice. *See H & R Block, Inc. v. Testerman, supra,* 275 Md. at 47, 338 A.2d 48.

■ That is not to say, of course, that an action for deceit can never arise out of an existing contractual relationship. Where a dispute occurs with respect to a term or condition or the nature or adequacy of the performance required and one party knowingly makes a false statement of his intention to perform, intending thereby to induce the other to take or refrain from taking some action that he has a right to take or not to take under the circumstances, we see no reason why such a false statement cannot serve as the basis of an action for deceit, if the other requisite elements of the tort are present. Courts have allowed a deceit action where a landlord, by means of false representations, induces a tenant voluntarily to quit the premises (*see Crawford v. Pituch*, 368 Pa. 489, 84 A.2d 204 (1951), and cases cited therein); it is not significantly different to allow the action where the landlord fraudulently induces a tenant, who has a right to quit, to remain.

■ As with Count II, we therefore look to the adequacy of the averments, and, once again, we find them deficient. Ms. Bocchini, according to her counterclaim, first complained to the landlord in early April, 1984. At some point before May 24, 1984, the landlord apparently sent a letter to Mrs. Seaberry regarding the noise (see ¶ 11 of the counterclaim, in which Ms. Bocchini allegedly requested the landlord to send "another letter to the upstairs tenants"). On June 25, the landlord reported that it "again had written to the upstairs tenants and that [it] expected complete compliance with the 'noise and behavior clause' of the lease agreement." See ¶ 13. Ms. Bocchini does not contend that that statement was false; nor does she allege that any further promises, after that time, were made by the landlord. Indeed, she avers that the landlord thereafter refused to promise or do anything more.

The general charge in ¶ 28 that the landlord's promises "to take action against the upstairs tenant" were false when made is thus belied by the specific averments of the counterclaim. The chronology pled by Ms. Bocchini shows

that the landlord did indeed take some action in furtherance of its promise and that, when that action proved unavailing, no further promises were made. In light of those averments, we find no error in the dismissal of Count III.

## IV. *Nuisance*

■ Count IV lies in nuisance, and we think it states a good cause of action. In *Gorman v. Sabo*, 210 Md. 155, 159, 122 A.2d 475 (1956), the Court held that

> "If noise causes physical discomfort and annoyance to those of ordinary sensibilities, tastes and habits and seriously interferes with the ordinary comfort and enjoyment of their homes, and thus diminishes the value of the use of their property rights, it constitutes a private nuisance, entitling those offended against to damages."

The counterclaim certainly alleges that much. Moreover, because, as we observed in Part I, the landlord was allegedly in a position to resolve the problem, the defense successfully raised in *Parklawn v. Nee, supra*, 243 Md. 249, 220 A.2d 563, is not available to it for purposes of the motion to dismiss. Accordingly, the dismissal of Count IV was improper.

## V. *Summary*

There was no error in the dismissal of Counts II and III, as they fail to state a claim upon which relief can be granted. Counts I and IV do state viable claims, however, and the dismissal of those counts was wrong. The case will be remanded for further proceedings on those counts. As the issue of whether Ms. Bocchini should be given leave to amend Counts II and III was not raised either below or before us, we express no opinion on it.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS; COSTS TO BE PAID ONE–HALF BY APPELLANT, ONE–HALF BY APPELLEES.