895 A.2d 1111

Andrew WARD

v.

Stephen A. HARTLEY, et al.

No. 175, Sept. Term, 2005.

Court of Special Appeals of Maryland.

April 10, 2006.

Francis A. Pommett, III, Baltimore, for appellant.

Jared Silberzahn (Clifford A. Robinson, H. Barritt Peterson, Jr., on the brief), Towson, for appellee.

Panel: SALMON, DEBORAH S. EYLER and THEODORE G. BLOOM (Ret., Specially Assigned), JJ.

SALMON, J.

This case had its origin on December 23, 2002, when a dog owned by Maconio Alston and his wife, Charlene Alston (the "Alstons"), bit Andrew Ward ("Ward"), causing him severe injury. Ward was bitten on premises rented by the Alstons from Stephen A. Hartley and his wife, Patricia.

Ward sued the Hartleys and the Alstons in the Circuit Court for Baltimore City for injuries caused by the dog bite. Ward alleged that the defendants were liable to him for negligence and strict liability.

The Hartleys filed a motion for summary judgment in which they claimed that Ward could not prove liability against them because:

1. As landlords they did not maintain control over the premises leased to the Alstons and therefore they owed no duty to the tenants' invitees (such as Ward) who were injured while on the leased premises.

2. Alternatively, even if Ward could prove that the Hartleys retained control over the portion of the premises where the injury occurred, Ward could not prove that they had any knowledge of the vicious propensities of the Alstons' dog prior to the date of Ward's injury.

3. Even if Ward could prove that the Hartleys had a duty to inspect the leased premises, Ward could not prove that had an inspection been made by them prior to the date of injury they would have discovered that the Alstons kept a vicious dog on the premises.

Baltimore City Circuit Court Judge Joseph Kaplan heard the Hartleys' motion for summary judgment and granted it on the grounds raised by the movants. Ward filed a motion to reconsider, which Judge Kaplan denied. Ward then dismissed, without prejudice, the Alstons as defendants and filed this timely appeal in which he contends that Judge Kaplan erred in granting summary judgment in favor of the Hartleys.

## I.

The Hartleys' motion for summary judgment and Ward's opposition thereto were based on the following material:

1. Copy of a lease between Mr. Hartley and the Alstons.[1]

2. A police report concerning the December 23, 2002, incident.

3. Interrogatory answers filed by Ward and Stephen Hartley.

4. Excerpts from the depositions of: (a) Ward; b) Maconio Alston; (c) Charlene Alston; and (d) Stephen Hartley.

## II.

Set forth in Part II is a summary of the material reviewed by the motions judge, which we have presented in the light

---

1. The lease was signed by both Mr. and Mrs. Alston and was also signed by Mr. Hartley. It was not, however, signed by Patricia Hartley. Nevertheless, she was named as a party below.

most favorable to Ward, the non-prevailing party below. *See* Md. Rule 2–501.[2]

About two-and-one-half years before Ward was bitten, Stephen Hartley and the Alstons entered into a lease dated March 20, 2000. The lease was a very simple one that required the tenants to pay rent on a monthly basis. There was no fixed term for the lease.

The leased premises consisted of a row house and the adjacent land known as 2692 Wilkins Avenue, Baltimore City. The lease did not contain a "no pets" prohibition; it did contain, however, several routine provisions, to which Ward directs our attention, i.e., (1) the Alstons were prohibited from conducting any business on the leased premises without the express consent of the landlord; (2) the Alstons were prohibited from subletting or assigning the leased premises without Mr. Hartley's prior written authorization; (3) the Alstons were prohibited from keeping on the premises anything that would affect the fire insurance that covered the dwelling and its contents; (4) the tenants promised that they would not violate any "federal, state, or local ordinance"; (5) the landlord retained "the right to enter the premises at reasonable hours of the day to examine the same" provided, however, that the tenants gave their consent and were given "reasonable advance notice of the inspection"; and (6) if the Alstons failed to pay rent or failed to abide by any of the covenants in the lease, then Mr. Hartley had the right to file a court action against the tenants for "possession, rent, or damages."

Ward was bitten by the Alstons' dog, Sammy, at 9:30 a.m. on December 23, 2002. At the time of the incident, Maconio and Charlene Alston lived at the leased premises with their two daughters, Alexis, age eleven, and Atlantis, age nineteen, along with Atlantis's husband.

---

2. Excluded from our summary are facts that are not germane to the issue of whether Ward could prove that the landlords' negligence caused his injury.

Ward, a cabdriver, went to the Alstons' home to pick up Alexis, who had an appointment at the Kennedy Kreiger Institute. When he arrived at the Alstons' home, he honked his horn, got no response, and then went to the Alstons' front door and knocked. He heard someone (later identified as Charlene Alston) tell the children not to open the door. When Ward heard this, he stepped back. At about the same time, a child, apparently Alexis, opened the front door. As the child did so, someone inside the house hollered, "Get the dog." Ward then saw a pit bull dog that "looked big" come "charging" out of the house. Ward hit the dog over the head with some rolled up cab sheets. The dog spun around and bit Ward's right foot. Ward then ran back to his cab and climbed on the top of it, even though the dog's jaws were still clamped onto his foot.

A police cruiser, which happened to be driving by at the time, stopped after Ward signaled for it to do so. "Two boys"[3] ran out of the Alstons' row house and, while laughing, grabbed the dog and brought it into the house. Charlene Alston then came out of the house. While smoking a cigarette and in the presence of the police officer, she said, "I told them [about] that [expletive] dog."[4] As a result of the dog bite, Ward's foot was severely injured, and he was required to undergo surgery to repair the damage.

The police report, which was attached to Ward's opposition to the motion for summary judgment, read, in pertinent part, as follows:

> Ms. Charlene Alston . . . came out [of the row house] and retrieved . . . [the pit bull]. . . . The owner of the three-year-old pit bull (Sammy)[,] Ms. Alston[,] advised that her dog has never done this before. She further advised that Sammy has all his vaccinations but couldn't provide proof. . . .

Maconio Alston testified at deposition that, prior to the December 23, 2002, incident, Sammy, who he said was a "pit

---

3. The record does not reveal the identity of the "boys."

4. The record does not indicate what expletive Mrs. Alston used.

bull-chow mix," had never showed its teeth to anyone in an aggressive manner, never bitten anyone, nor had he done anything else to lead him to believe that the dog was vicious or dangerous. When his wife, Charlene Alston, was deposed, she corroborated her husband's testimony that the dog had never shown vicious propensities.

Mrs. Alston also said in deposition that, when she yelled "Don't open the door," she did so because she did not want Alexis to open the door and leave the house with a stranger. She denied that she yelled the command because she was afraid that the dog might get out of the house or that he might attack someone.

Mr. Hartley ("Hartley") testified at his deposition that the Alstons moved into the rental property on March 19, 2000. According to Hartley's testimony, Mr. Alston had the responsibility of maintaining the property. Between the date that the property was rented and the date of the dog-bite incident, Hartley never inspected the inside of the house that he rented, but approximately every three to four months he would "drive by to make sure all the windows were still there and stuff like that. . . ." Hartley did not even know that the Alstons kept a dog on the leased property until he was notified of the December 23, 2002, dog-bite incident.

### III.

In *Hemmings v. Pelham Wood Ltd.*, 375 Md. 522, 537–38, 826 A.2d 443 (2003), Judge Lynne Battaglia, for the Court of Appeals, set forth several principles of law that are here important, *viz.*,

> When a landlord has leased property but has not parted control with a portion of it, we have held that the landlord may be liable for a foreseeable injury caused by a known dangerous or defective condition located within the part of the property over which the landlord retained control. As our discussion will highlight, the duty of a landlord in these cases depends on the existence of three circumstances: (1) the landlord controlled the dangerous or defective condition;

(2) the landlord had knowledge or should have had knowledge of the injury causing condition; and (3) the harm suffered was a foreseeable result of that condition.

A landlord's control over conditions on its premises always has been a critical factor that we consider in determining landlord liability. Judge Eldridge, speaking recently for the majority of the Court in *Matthews v. Amberwood Assoc.*, 351 Md. 544, 557, 719 A.2d 119 ... (1998), described our traditional emphasis in premises liability cases addressing the landlord's control over the dangerous or defective condition:

> [A] common thread running through many of our cases involving circumstances in which landlords have been held liable (*i.e.*, common areas, pre-existing defective conditions in the leased premises, a contract under which the landlord and tenant agree that the landlord shall rectify a defective condition) *is the landlord's ability to exercise a degree of control over the defective or dangerous condition and to take steps to prevent injuries arising therefrom.*
>
> *Conversely, when a landlord has turned over control of a leased premises to a tenant, it ordinarily has no obligation to maintain the leased premises for the safety of the tenant. See Matthews*, 351 Md. at 556–57, 719 A.2d 119 ... ("The principal rationale for the general rule that the landlord is not ordinarily liable for injuries caused by defects or dangerous conditions in the leased premises is that the landlord 'had parted with control.' ") (quoting *Marshall v. Price*, 162 Md. 687, 689, 161 A. 172 ... (1932)); *Elmar Gardens, Inc. v. Odell*, 227 Md. 454, 457, 177 A.2d 263 ... (1962) ("Mere ownership of land or buildings does not render the owner liable for injuries sustained by tenants or invitees rightfully on the premises, for the owner is not an insurer of such persons but owes them the duty only to exercise ordinary care to render the premises reasonably safe."); *Marshall*, 162 Md. at 689, 161 A. 172 ... ("The law is well settled that, when the owner has parted with his control [of a leased premises], the tenant has the burden of the proper keeping

of the premises, in the absence of an agreement to the contrary; and for any nuisance created by the tenant the landlord is not responsible.").

In *Matthews*, Judge Eldridge included "common areas" among the portions of a landlord's property over which it retains control. This reference to "common areas" relates to situations "where a landlord leases separate portions of a property to different tenants and reserves under his control halls, stairways, and other portions of the property used in common by all tenants." *Elmar Gardens, Inc.*, 227 Md. at 457, 177 A.2d 263 ... (citing *Landay v. Cohn*, 220 Md. 24, 150 A.2d 739 ... (1959)). In such situations, we have required landlords to "exercise ordinary care and diligence to maintain the [common areas] in a reasonably safe condition." *Langley Park Apartments v. Lund*, 234 Md. 402, 407, 199 A.2d 620 ... (1964). "This Court, thus, has sustained landlord liability for injuries that occur in common areas within the landlord's control where it can be shown that the landlord knew or had reason to know the danger existed." *Shields v. Wagman*, 350 Md. 666, 675, 714 A.2d 881 ... (1998).

(Emphasis added.)

The Court of Appeals said, almost seventy-five years ago, in *Marshall v. Price*, 162 Md. 687, 689, 161 A. 172 (1932):

The law is well settled that, when the owner has parted with his control, the tenant has the burden of the proper keeping of the premises, in the absence of an agreement to the contrary; and for any nuisance created by the tenant the landlord is not responsible.

Ward recognizes that in order for him to prevail against the appellees he was first required to present proof to the motions judge that the appellees controlled the portion of the premises where the dangerous or defective condition existed. *See Hemmings, supra*, 375 Md. at 537, 826 A.2d 443; *see also Klitzka ex rel. Teutonico v. Hellios*, 348 Ill.App.3d 594, 284 Ill.Dec. 599, 810 N.E.2d 252 (2004) (holding that a landlord owes no duty to a third-party invitee for injuries caused by the

tenant's animal who causes injury on a portion of the leased premises over which the landlord lacked control.); *Goddard v. Weaver*, 558 N.E.2d 853, 854 (Ind.Ct.App.1990) (summary judgment in favor of the landlord affirmed when a child was attacked by a dog belonging to a resident of leased property when landlord had relinquished control over the portion of the property where the injury occurred).

Citing *Hemmings, supra*, and *Matthews v. Amberwood Assocs.*, 351 Md. 544, 719 A.2d 119 (1998), Ward asserts that the "primary issue" presented in this appeal "is whether Mr. Hartley retained control over the leased premises and to what extent." He argues:

It is clear from the lease that Mr. Hartley did in fact retain control over Mr. Alston's conduct and use of the premises under the terms of the lease. If Mr. Alston violated the terms, Mr. Hartley could have given him notice to correct the situation, and if Mr. Alston failed to comply, he could have sought eviction through the [D]istrict [C]ourt.

Keeping a pit bull did not violate any covenant of the lease, nor did it violate any law or ordinance. No provision of the lease gave the landlord control over any portion of the rental premises. Thus, appellees had no duty to inspect the premises.

Ward contends, however, that keeping this particular pit bull created a nuisance and thus did violate a Baltimore City ordinance that granted the landlord, after giving the tenant thirty days' notice, the right to terminate the tenancy. According to Ward, the Alstons' dog was a nuisance, because (purportedly) it could be inferred that it had exhibited dangerous propensities prior to the date Ward was bitten.

In making the foregoing arguments, Ward acknowledges that the Alstons said at deposition that their dog had never shown vicious propensities prior to the subject incident. He contends, however, that a jury could disbelieve that testimony and infer that the dog had shown prior vicious propensities. According to Ward, such an inference could be drawn from the fact that (1) Ward heard Mrs. Alston yell, "Get the dog"

immediately before the pit bull escaped through the front door and (2) Mrs. Alston said in the police officer's presence, "I told them about that [expletive] dog."

Inferences must be based on reasonable probability, rather than speculation, surmise, or conjecture. *Chesapeake & Potomac Tel. Co. of Md. v. Hicks,* 25 Md.App. 503, 524, 337 A.2d 744 (1975). The fact that an occupant of a house shouts "Get the dog" before a door is opened simply cannot support the inference that the dog had prior dangerous propensities. A large portion of the canine population, when given an opportunity, will run outside if a door is opened, and a prudent dog owner, concerned for the safety of the animal, would not let a pet wander the streets.

Based on the police report, which Mr. Ward relied upon in his opposition to the motion for summary judgment, it is undisputed that Charlene Alston told the investigating police officer "that her dog had never done this [bitten someone] before." Her statement, "I told them about that [expletive] dog," when considered in conjunction with the fact that she also told the officer that the dog has "never done this before," does not support a legitimate inference that Mrs. Alston knew, prior to the incident, that the dog was vicious. Moreover, even if the statement ("I told them about that [expletive] dog") is viewed in isolation and other statements made by Mrs. Alston are disregarded, what she said is too ambiguous to support the inference that Mrs. Alston had told "them" that Sammy was vicious. What she previously had told "them" could have been, for instance, that the dog would escape if the door were opened.[5] Because it is unclear as to whom she told or what she told others about the dog, we reject Ward's

---

5. When a court is called upon to decide a summary judgment motion, it considers only evidence that would be admissible if a trial were held. As against the Hartleys, what appellant claims that Mrs. Alston said in the presence of the police officer, while smoking a cigarette, is hearsay. Based on the record before us, it does not appear to be an "excited utterance." (*See* Md. Rule 5–803(b)(2)). Nor does the statement appear to come within any other exception to the rule barring hearsay testimony. *See* Rules 5–802—5–803. Thus, it is doubtful that Mrs. Alston's statement would be admissible against the appellees.

contention that Mrs. Alston's statement indicated "that she knew the dog had vicious propensities and would attack."

But, even assuming, *arguendo*, that it could be inferred legitimately from Mrs. Alston's statement that she knew that Sammy was dangerous, there was not a scintilla of evidence that the appellees knew, or reasonably should have known, that the dog had vicious propensities and therefore constituted a nuisance. First, and most important, no statute, principle of common law, or provision in the lease imposed upon the landlord the duty to inspect the leased premises to see if a vicious animal was being kept. Second, there was no evidence presented that, at the time the lease was signed by Mr. Hartley, he knew, or would have had any way of knowing, that a vicious animal was to be kept on the premises.

We hold that the motions court correctly granted summary judgment in favor of the appellees because, as of the date of the plaintiff's injury, the appellees did not have control over the portion of the premises where "the dangerous or defective condition" existed and thus had no duty to inspect.[6] *See*

---

**6.** Appellant argues as follows: "It is not a question of whether Mr. Hartley approved of the Alstons' keeping a pit bull; rather, '[w]here, through lease provisions or otherwise, he has that ability, the thought is that he ought not to be able to escape his obligation under a covenant of quiet enjoyment by steadfastly refusing to exercise his authority.' " (quoting *Bocchini v. Gorn Mgmt. Co.*, 69 Md.App. 1, 12, 515 A.2d 1179 (1986)). *Bocchini* and the principles enunciated therein have no application to this case.

The facts in *Bocchini* were these: Carol Bocchini rented an apartment from the appellee, Gorn Management Company. The management company also rented an apartment to an upstairs neighbor of Bocchini's who made an excessive amount of noise. *Id.* at 4, 515 A.2d 1179. Ms. Bocchini complained to the management company about the noise problem, but the management company refused to take any action. *Id.* at 5, 515 A.2d 1179. Due to the problem, Ms. Bocchini vacated the apartment. *Id.* at 3, 515 A.2d 1179. In a lawsuit that Ms. Bocchini later filed against the management company, she contended, *inter alia*, that all leases contain the implied covenant of quiet enjoyment; moreover, Ms. Bocchini's lease, as well as that of the offending neighbors, contained a restriction against excessive noise or other offensive conduct. *Id.* at 12, 515 A.2d 1179. The Bocchini Court said that the management company, because of covenants in its lease, did have a right to control the actions of third parties (the upstairs neigh-

*Hemmings,* 375 Md. at 537, 826 A.2d 443 (citing *Matthews,* 351 Md. at 557, 719 A.2d 119).

Appellant contends that Mr. Hartley reasonably should have known that the Alstons' dog was vicious because he had "constructive notice" of that fact. In the words of appellant, "One cannot stick one's head in the sand and complain that he never saw that which was there to be seen."

The argument that the defective condition was "there to be seen" impliedly assumes that Mr. Hartley was required to inspect the leased premises after the rental. But, as already demonstrated, the landlord had no such duty. And, even if the landlord had a duty to inspect the premises, there was no evidence presented to the motions court that would support the inference that if inspections had been made at reasonable intervals prior to December 23, 2003, such inspections would have uncovered the fact that Sammy had vicious propensities.

For the foregoing reasons, we hold that Judge Kaplan correctly granted summary judgment in favor of the Hartleys.[7]

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

bors), and therefore Ms. Bocchini had sufficiently pled a breach of the implied covenant of quiet enjoyment and as a consequence the management company's failure to take action to abate the noise amounted to a constructive eviction of Ms. Bocchini. *Id.* at 12, 515 A.2d 1179. Quite obviously, a covenant of quiet enjoyment has nothing to do with this case because the landlord is not being sued by a tenant; rather, the landlord is being sued by a third party. A third party has no right of "quiet enjoyment" of the leased premises.

7. The appellant invites us "to establish an evidentiary rule that harboring a 'dog commonly known as a pit bull' is *prima facie* evidence of ownership of a vicious dog." We decline that invitation. First, it would be improper to do so because the appellees had no duty to inspect and discover Sammy's presence. Moreover, it is far from clear from this record that Sammy was "a pit bull dog." His owners described him as part pit bull and part chow. But, even if we were to assume, *arguendo,* that Sammy was pure pit bull, it is very doubtful, as a factual matter, that all pit bulls (dogs) are dangerous. Under such circumstances, it would be highly improper to impose, by judicial fiat, a principle that everyone should know that "fact."